[No. 26383. *En Banc.* August 9, 1937.]

JOHN J. MILLER, *Respondent*, v. GEORGE I. CLITHERÓ, *Appellant*.[1]

*McAulay & Freece*, for appellant.

*Clark & Grady* and *Velikanje & Velikanje*, for respondents.

MILLARD, J.—By amended complaint, it. is alleged that, between July 14 and 19, 1934, the defendant orally promised and agreed to deliver to the plaintiff, immediately upon payment therefor, one hundred shares of the capital stock of the Curtis-Wiley Marine Salvors for fifteen hundred dollars, and twenty-five shares of the capital stock of that corporation for three hundred seventy-five dollars. It is further alleged that the consideration for the contract wholly failed, in that

[1]Reported in 70 P. (2d) 1021.

the defendant refused to deliver any of the shares of stock to the plaintiff; that, upon the failure and refusal of the defendant to deliver the shares of stock, plaintiff demanded, on or about August 13, 1934, return of the eighteen hundred seventy-five dollars paid therefor, which defendant refused to do; hence, this action praying judgment for the amount paid for the stock.

Answering, the defendant denied that he promised to sell to the plaintiff any shares of stock and affirmatively pleaded that, on or about July 7, 1934, he employed Frank C. Jackson, of Seattle, to sell on commission certain interests in what was known as the "S. S. Islander Project," an undertaking of the Curtis-Wiley Marine Salvors, and then delivered to Mr. Jackson certain documents entitled, "Declaration of Trust," representing interests in the project; that plaintiff purchased those interests, for which he paid $1,875; and that the plaintiff received and kept what he bought.

The cause was tried to the court, which found that, on or about July 9, 1934, defendant, who owned shares of stock in the Curtis-Wiley Marine Salvors, a corporation, and also owned certain rights of participation in the profits expected to be derived from the salvaging of a sunken vessel known as the S. S. Islander, authorized Dwight L. Jones, of Yakima, a broker, to sell and dispose of an interest in the project,

". . . of one-half of one per cent of forty-seven and one-half per cent (47½%) of the entire project for the sum of $15 per share which the said Jones understood to be stock in the corporation; that the said Dwight L. Jones acting pursuant to said authority contracted to sell said corporate stock and said Islander percentages to the plaintiff for the sum of $1500; that it was represented to the plaintiff by the said Dwight L. Jones that the said corporate stock had and carried with it the said percentages and thereupon the plaintiff on July 14, 1934, paid to him for and in behalf of the defendant the said sum of $1,500 and there was

delivered to the plaintiff two certain documents denominated 'Declarations of Trust' and introduced in evidence as exhibits 'A' and 'B', and at the time of the delivery thereof it was explained and represented to the plaintiff that upon presentation of said documents to the secretary of the corporation the 100 shares of corporate stock in said corporation being purchased by him would be transferred to him upon its books; that Certificate No. 137 referred to in said documents covered and represented a certificate of stock by that number which the defendant owned and held in said corporation and at all times the plaintiff intended to purchase and believed he was purchasing 100 shares of stock in said corporation which had and carried with it as an incident thereto the said percentages in said S. S. Islander Project.

"(3) On or about the nineteenth day of July, 1934, the defendant authorized L. F. Drake, of Yakima, Washington, to sell and dispose of twenty-five shares of the capital stock of said corporation, together with and as an incident thereto one-fourth of one per cent of forty-seven and one-half per cent (47½%) of the entire profits from said S. S. Islander Project, and thereupon the said L. F. Drake stated and represented to the plaintiff that he had said shares of stock for sale together with said interest in said Islander Project for the sum of $375, and thereupon the plaintiff made such purchase, paying therefor the said sum of $375 on July 19, 1934, which was received by the defendant, and said L. F. Drake delivered to the plaintiff a certain document on file herein marked exhibit 'F' and represented and explained to the plaintiff that said document had reference to the sale of said stock and interest in said Islander and upon presentation of the same to the secretary of the corporation, said 25 shares of stock would be issued to the plaintiff and transferred upon the books of said corporation.

"(4) In the making of said purchases and in the payment of said money, the plaintiff at all times was led to believe by said agents and representatives of the defendant and did believe that he was purchasing a total sum of 125 shares of the capital stock of said corporation and that the interest in the profits of the S. S.

Islander Project went with said stock and as an incident thereto and did not at any time intend to purchase interests in the S. S. Islander Project only."

The court made other findings, one of which was that some of the shares of stock carried no rights of participation in the anticipated profits of the salvage of the S. S. Islander, and concluded that plaintiff was entitled to judgment for $1,875, the amount paid by him for the shares of stock. From judgment entered in consonance with the foregoing, the defendant has appealed.

Counsel for appellant contend that the contracts entered into by the parties were supported by a substantial and valid consideration, and that respondent received, and retained possession of, that which was sold to him under the contracts; therefore, respondent is not entitled to a recovery of any part of the purchase price paid by him.

It is the position of the respondent that he entered into a contract for the purchase of a certain number of shares of the capital stock of the salvaging corporation, which carried with it, as an incident thereto, a total of one and one-fourth per cent of forty-seven and one-half per cent of the anticipated profits to be derived from the raising and salvaging of the S. S. Islander. He paid the purchase price of $1,875, but none of the shares of stock was ever delivered to him; hence, he became entitled to a return of the money paid by him. It is argued that the rule of law applicable to the facts in this case is that, where one contracts to sell and deliver property to another, who pays the purchase price therefor, and the vendor fails to deliver such property, the vendee may maintain an action in the nature of an action for money had and received to recover back the money paid. 41 C. J. 35.

The material facts are summarized as follows: The Curtis-Wiley Marine Salvors, a domestic corporation,

was engaged in the business of raising and salvaging sunken vessels. The particular objective of this corporation was the salvaging of the S. S. Islander, which sank many years ago off the Alaskan coast. It was supposed a large quantity of gold was in the vessel when she sank. Some of the stock of the corporation carried the right to participate in the profits expected to be derived from the salvaging of the Islander. Some of the stock carried no such advantage. Rights to participate in the profits of the Islander project were also sold separate and apart from any stock.

Appellant owned some shares of the stock of the corporation and also owned some rights of participation in any profits which might accrue from the Islander project, which rights were separate and distinct from the corporate stock. Frank C. Jackson, of Seattle, fiscal agent of the corporation, was authorized by the appellant to sell some of the appellant's rights to participate in the profits in the Islander project. Two declarations of trust, each in the following form, were signed by appellant and delivered to Mr. Jackson:

"DECLARATION OF TRUST
"KNOW ALL MEN BY THESE PRESENTS:
"That George I. Clithero, the undersigned, is now holding in his name a certain amount of percentage of the Curtis-Wiley Marine Salvors, under Certificate No. 137, which percentage participates in what is known as the S. S. Islander Project.

"This is to certify that one-half of one per cent of forty-seven and one-half per cent of the entire profits of said project belongs to ........................................, and is being held by the undersigned in trust for him, the same to be transferred upon the books of the corporation as soon as this instrument is presented to the secretary of said corporation.

"Witness my hand and seal this 9th day of July, 1934.
"WITNESS:                           GEO. I. CLITHERO
   "FRANK C. JACKSON"

When the rights were sold, the name of the purchaser would be written in the declaration, as was the name of respondent when he purchased the certificates as herein set forth.

On July 9th, as a result of a conversation Mr. Jones, of the brokerage firm of Jones and Drake, of Yakima, had with Mr. Jackson in Seattle, the latter sent to the Yakima First National Bank the two declarations of trust referred to above. Mr. Jones had not, prior to this time, any communication with appellant concerning the matter. Mr. Jones informed Mr. Drake of the situation, and the latter endeavored to interest the respondent in the proposition.

On July 12th, the respondent, accompanied by Messrs. Jones and Drake, went to the Yakima bank and examined the documents, which none of the three had seen prior to that time. Mr. Jones informed respondent that the matter was complicated, and that the corporate stock was in escrow and would be issued later; and that the documents then in the Yakima bank should be sent by the purchaser to the office of the corporation in Seattle and there entered on the corporate books, whereupon the shares of stock would be delivered. Respondent insisted that the price should be reduced. After some discussion between appellant and the brokers, it was agreed that the two "declarations" should be sold for fifteen hundred dollars, which amount the respondent shortly thereafter paid to the bank and took possession of the papers. On July 19th following, through Mr. Drake, the respondent purchased for three hundred seventy-five dollars from appellant another document of a similar nature, carrying the right to one-fourth of one per cent of forty-seven and one-half per cent of the Islander project.

A few days subsequently, the respondent went to Seattle and presented to the secretary of the corpora-

tion the three documents which he had purchased. Respondent testified that he exhibited the three documents to the secretary and requested that an entry be made on the books of the corporation of "these orders for stock." The secretary informed respondent that he was not entitled to any shares of stock. The respondent then called on the appellant and demanded the shares of stock to which he thought he was entitled. Respondent informed the appellant that both Jones and Drake advised him that he was to receive shares of stock in the corporation.

The respondent did not offer to return to the appellant the three papers he had purchased. When Jackson later in the day called at the hotel to talk with the respondent, the latter did not offer to return to Mr. Jackson the three documents. At that time the respondent was informed by Mr. Jackson that the three certificates did not entitle the respondent to any stock; that all respondent purchased was an interest in the Islander which would entitle the respondent to a portion of the profits derived from the salvage of the Islander. At that time—the respondent so testified—it is clear that the respondent retained the three documents under which he was entitled to a percentage of the profits which might accrue from the salvage of the Islander because he believed that he would receive a large return for his investment. He then knew that he was not entitled under the three certificates to any shares of stock. We quote, as follows, pertinent testimony of the respondent:

"Q Did you, when Mr. Jackson came to the hotel to talk with you, offer to return to Mr. Jackson these three exhibits, A, B, and F? A No. I didn't offer to return no papers. Q And then you had your talk with Mr. Jackson and in that Mr. Jackson explained that these certificates did not carry stock with them? A Well, he explained there was no stock there.

Q What you had bought was an interest in the Islander, and you would get your part of the gold? A Yes, that is what he explained. Q Why didn't you return these three documents to Mr. Clithero that day? A I would return them if I got my money back, but not otherwise. Q You still had some hopes that there would be money on the Islander? A Yes. Q And if there were, you knew these instruments would be worth something? A Possibly. Q It would depend upon what was on the Islander? A Yes. Q But you knew if there was any substantial amount on the Islander, these papers would become very valuable? A Possibly, if the money was there. If — Q You knew too that if there was a million dollars on the Islander, that one per cent of forty-seven and a half per cent would bring you four thousand seven hundred and fifty dollars? A I didn't know that particularly. Q Isn't that one per cent of forty-seven and a half per cent out of a million? A Probably. Q So, if there was a million dollars, and you got your distributive share, it would be four thousand seven hundred and fifty dollars? A I guess so. Q You had heard a good many times, up to that time, that there was a likelihood of there being a million on the boat? A Yes. Q And that is the reason you didn't turn these back to Mr. Clithero, unless he gave you your money back? A Yes."

Mr. Jackson testified that, when respondent called on him at the hotel in Seattle, he offered to sell the three documents for the respondent. Respondent informed Mr. Jackson that he did not want anyone to make "any money off him." If there was money on the Islander, he wanted his part of it.

On July 30th, while in Yakima on business, appellant, on request of Mr. Drake, called on respondent at the latter's office in Yakima, at which time respondent prepared a two day option for resale by the appellant of the respondent's interests in the project. Appellant desired an option for ten days or two weeks, which was refused by respondent, who limited the option

to "what amounted to two days." The reason given by respondent, according to the testimony of the appellant, why the respondent refused to give an option for more than two days, was, "he said the gold might come up at any time and he didn't want us making any money out of him."

On July 26, 1934, two days after the demand of respondent on appellant in Seattle and four days prior to the granting of the two day option by respondent to appellant, the Islander was beached. The salvage of the vessel did not result in any profit to the investors. No sale was consummated by the appellant within the time limited by the respondent, and several months later this action was instituted.

An examination of the record does not disclose any misrepresentation by the appellant, by the two brokers, or by Mr. Jackson. Accepting as true the testimony of the respondent, he purchased the interests represented by the three documents described above with the belief that he was entitled to certain shares of stock in the salvage corporation. However, as recited above, he learned when he called on Mr. Jackson and the appellant in Seattle, that he was entitled solely to participation in the anticipated profits of the salvage of the S. S. Islander. Fully informed, as he was at that time, that his interest was limited to a certain percentage of the proceeds which might be derived from the salvage of the Islander, and that he was not entitled to any shares of stock of any kind in the Curtis-Wiley Marine Salvors corporation, he retained and exercised dominion over the rights of participation in the profits expected to be derived from the Islander project until this action was commenced.

At the time he made his demand for the shares of stock, such stock had only a nominal value, while the "percentages" in the Islander project had a market

value approximating or in excess of the amount paid by respondent for the interest in the Islander project. The shares of stock were in escrow and were non-participating as to the Islander project. Whether the Islander had a substantial amount of gold, would make no difference in the value of the so called non-participating stock. The percentages received by the respondent and kept under his control and which he refused to surrender in order to receive the stock which he claimed as his own under the contract, had a market value. Respondent's interest actually had a market value of approximately the amount he paid therefor, which consideration he retained until the time of the trial.

No tender was ever made by him to the appellant. In fact, he refused to surrender because it is patent that he anticipated large returns from the Islander. When the Islander was beached and an inspection of that vessel disclosed the absence of gold, respondent was hardly in a position to commence an action then for money had and received, tender to the appellant the documents representing the interest in the Islander project, and then demand return of the money he paid to the appellant, on the ground that the consideration had failed.

Counsel for respondent argue that the complaint does not set up any facts calling for rescission of any contract. It is, insists counsel for respondent, based upon the theory that respondent contracted to buy stock for which he paid but never received. It is urged that, when his money is returned to the respondent, the appellant is entitled to the return of the documents representing the interests in the Islander project, but that a tender of those documents is not a condition precedent to a suit for the money paid; that it is sufficient that the documents be delivered into court as respondent did at the trial.

The rule is that, where money has been received by a defendant under any state of facts which would, in a court of equity, entitle the plaintiff to a decree therefor, the facts will entitle the plaintiff to recover in an action for money had and received. It is quite true that, when there is nothing to be done by the plaintiff to place the defendant *in statu quo*, the action for money had and received is in itself a rescission as well as a demand. *Bither v. Packard*, 115 Me. 306, 98 Atl. 929.

While in an action for money had and received, no showing need be made of a tender if nothing of value has been received by the plaintiff, the action being in its nature equitable, if anything of value has been received by the plaintiff, it must be shown, to entitle the plaintiff to recover, that it was tendered back before the action was brought. 2 R. C. L. 779.

In an action for money had and received, only what is equitably due may be recovered by the plaintiff. Under the facts in the case at bar, no showing has been made entitling respondent to a recovery. That which he received for the money paid by him to the appellant was of value, it having market value at the time he demanded the shares of stock. Refusing to surrender that which he received, gambling on the returns which might be his in the salvage of the Islander, he retained possession of his interest in that project until he discovered that the project had failed and there would be no profits. By his own testimony, the respondent, who is entitled to only what is equitably due, discloses he is not entitled to recover.

Judgment is reversed, and the cause is remanded with direction to the trial court to dismiss the action.

STEINERT, C. J., BLAKE, GERAGHTY, and ROBINSON, JJ., concur.

TOLMAN, J. (concurring in the result)—I agree with the minority that the record warrants a holding that the respondent, upon the representation made to him, believed that he was buying capital stock to which the declarations of trust delivered to him were appurtenant, and that he at all times insisted and demanded that there be delivered to him the capital stock which he was induced to think he had purchased. But, even so, under all of the facts disclosed by the record, the respondent could in no event recover more than the reasonable value of the capital stock so purchased which was not delivered.

It rather clearly appears from the record that this stock at none of the times mentioned had any market value, and that, at the time this action was brought, the stock was worthless. Therefore, the respondent was not damaged by the nondelivery of the capital stock to him and is not entitled to recovery.

I therefore concur in the result reached by the majority.

BEALS, J. (dissenting)—In my opinion, it clearly appears that it was represented to respondent that he was buying stock, to which the declarations of trust which he received were appurtenant. Respondent promptly demanded his stock, and at all times insisted that he should receive the same. In view of respondent's conduct, as recited in the majority opinion, it may be that he is entitled to no more than damages in an amount equal to the value of the stock which he did not receive. While it is probable that this stock at the time had little value, as a legal proposition respondent is entitled to have that value determined and judgment awarded him for such damages as he may have suffered by reason of its non-receipt.

For this reason, I dissent from the conclusion reached by the majority that the action should be dismissed.

MAIN and HOLCOMB, JJ., concur with BEALS, J.